Edward P. Anderson and Michael J. Long, Successor Trustee, Appellees, v. Pearl Weiss et al., Appellees.

Appeal of Sol Horwitz, Appellant.

Gen. No. 41,423.

Opinion filed February 26, 1941.

WESLEY F. TEGTMEIER, of Chicago, for appellant.

No appearance for appellees.

MR. JUSTICE BURKE delivered the opinion of the court.

On August 3, 1928, Harry Weiss and Pearl Weiss executed a first mortgage trust deed to the Phillip State Bank and Trust Company, as trustee, conveying certain real estate to secure an indebtedness of $90,000, evidenced by 220 bonds. By reason of defaults, a bondholder accelerated the maturity of all the bonds, and in 1932 filed his bill to foreclose for the benefit of all the bondholders. Shortly thereafter the successor trustee, as the representative of all the bondholders joined in the proceedings as plaintiff, the trustee, a banking corporation, having been dissolved. On May 13, 1936, a decree was entered in the usual

form finding that there was then due to the bond-holders in principal and interest the sum of $133,-931.63, and to the successor trustee the sum of $4,319.50. The latter sum embraced solicitor's fees in the sum of $3,750, successor trustee's fees of $450, stenographer's charges of $11.50, and charges by the Chicago Title & Trust Company of $108. The amount found due to the successor trustee, together with fees and expenses of the proceedings, are, by the decree, declared to be a first and prior lien on the premises. Following the decree, over a period of almost 4 years, eight sales were held by the master. At the first five sales no bidder appeared. At the sixth and seventh sales bids lower than that of the petitioner were made, and in each instance the sales were disapproved by the chancellor. Upon order of the chancellor, one of the sales was advertised in every daily newspaper in Chicago at a cost of over $500. At the eighth sale held on May 7, 1940, Sol Horwitz bid the sum of $7,000. That being the highest bid, the master sold the premises to him. The master's report shows that all the requirements of the foreclosure decree were followed. In addition, advance notice of the sale was given to all the known bondholders. At the coming in of the master's report of such eighth sale, the plaintiff, Michael J. Long, as successor trustee, filed his petition seeking the court's instructions thereon, and setting forth all the material facts concerning the property. No other party filed any pleading and no objections to the master's report of sale were filed. Pursuant to leave of court, Horwitz filed his verified petition seeking a confirmation of such sale, and a rule was entered on all parties to answer. Only the plaintiff, Michael J. Long, as successor trustee, answered. Advance notice of the hearing was given to all known bondholders. Although there are over 100 bond-holders, only 3 bondholders were represented by counsel at the hearing. These bondholders orally ex-

pressed dissatisfaction with the amount of the return to them on their bonds and urged as their sole reason for opposing the confirmation the hope that some day the property might be worth more. The petition of the successor trustee represented that "if the sale of March 7th is approved there will be available for distribution to the bondholders approximately 2% of the face amount of the bonds." An expert real estate appraiser testified concerning the nature and value of the property and his written appraisal was received in evidence. This evidence, which was uncontroverted, shows that the property, located at 6232-6238 Broadway in Chicago, consists of a three-story building containing four stores and eight four-room apartments. The lot has a width of 75 feet and a depth of 125 feet. At the rear is a two-story building containing five garages and a loft. He represented that in order to preserve the building and obtain normal rentals, certain repairs were immediately necessary, namely, 1. Redecorate apartments and hallways; 2. Paint all exterior woodwork including porches; 3. Repair garage doors, bulged floor in south store and repair north store window front; and 4. Tuckpoint all stonework. He also stated that Broadway is a commercial street and that the neighborhood of this property is developed with buildings occupied by commercial tenants; that there is a lack of concentration of business in the neighborhood and an absence of national chain stores; that the property is not a good commercial piece; that the stores are of a secondary type in the midst of warehouses, garages and hardware stores; that because of the absence of the concentration of business in the neighborhood, and the location of the building on a commercial street, rentals are low, and there is no likelihood of an increase in rentals; that from the schedule of rentals it appears that if the building is put in good condition under owner operation, the stabilized rental, which is the basis used in fixing the economic valua-

tion, would produce a normal gross income of $6,534, which is $1,667 more than the income at the time of the appraisal. He further reported that because of the type of construction, expenses were comparatively high. His opinion was that the property has a physical valuation of $40,921, and an economic valuation of $23,493, based on a capitalization rate of 7½ per cent, and that the fair cash market value of the property, land and building, is not in excess of $25,000. He stated that the building "is the wrong type for the neighborhood, and its type has depreciated not only the value of the building but also the land on which it stands. For this reason the fair cash market value is closer to the economic value than to the physical value." At the conclusion of the hearing the chancellor inquired whether the sum of $1,000 was available to be expended for the purpose of increasing the rents. A bondholder's attorney advised the court that no such funds were available for such purpose. The record further shows that: (1) The bondholders' committee was not in a position to make a bid of any amount at a foreclosure sale. (2) The delinquent general real estate taxes and penalties are in excess of $19,000 and taxes will accrue during the redemption period. In addition, delinquent special assessments exceed $600. The current tax bill is $1,561. Penalties on accrued taxes are $1,200 per year. (3) The property has been, since July, 1934, and is now in the possession of the county treasurer, as receiver under a tax receivership proceeding, and all net income has been applied toward payment of delinquent taxes and penalties. (4) During the year 1939 the gross income from the property was $4,867 and operating expenses were $3,679, leaving available only $1,188 for payment on 1939 taxes of $1,561 and 1939 penalties of $1,200 on prior delinquencies, and thus leaving a deficiency of over $1,500 on tax requirements for the year 1939. In disapproving the sale, the court stated: "You are the people

who are concerned here. It is to your best interests, and I think we ought to wait and hope. I don't care what the price of sale is because they are getting the property and some day it might be worthwhile.'' This appeal is prosecuted by Sol Horwitz, purchaser at the master's sale, for the purpose of reviewing the action of the chancellor in disapproving the sale. The appellant was the only party to file a brief. We are, therefore, deprived of the benefit of opposing views, if any.

Appellant states that the uncontroverted evidence affirmatively shows that the sale price was equal to the value of the property, and that under the circumstances the denial of confirmation of the master's report of sale constitutes an arbitrary and unreasonable exercise of judicial discretion. He calls our attention to the case of *Shultz v. Milburn*, 366 Ill. 400, where the court said (403):

''A sale by a master in chancery is not, until confirmed by the court, a sale in a legal sense. The chancellor has a broad discretion in its approval or disapproval. The highest bidder . . . acquires no interest in . . . the land and his bid is a mere offer to purchase. Confirmation is final consent, and the court being in fact the vendor, may consent or not, in its sound judicial discretion. This discretion, unless abused, will not be interfered with by a court of review. . . . However, the discretion thus vested in the court is not a mere arbitrary discretion but must be exercised in accordance with established principles of law.'' Appellant also cites *Levy v. Broadway-Carmen Bldg. Corp.*, 366 Ill. 279. There, at a foreclosure sale, the mortgagee bid $50,000. The equity owner filed objections and claimed that the property was worth $80,000 and that the bid was inadequate. Both parties produced affidavits in support of their respective views as to the value of the property. The chancellor found the property to be worth $80,000 and

disapproved the sale. On appeal it was held that although the court had power to disapprove a sale for gross inadequacy, no such gross inadequacy existed in the $50,000 bid as would warrant disapproval of the sale. The court said (292):

"The proof did not sustain a greater value than $50,000 at the time of the sale, but if it be assumed that this was somewhat inadequate, the fact that there was a depressed market for real estate would not be a sufficient circumstance, coupled with the supposed inadequacy in the bid, to warrant the chancellor in disapproving the master's report of sale. The power to disapprove a sale for gross inadequacy of bid exists independent of an economic depression. The chancellor abused his discretion and erred in refusing to approve the sale at $50,000." In the case at bar the evidence shows that the building is the wrong type for the neighborhood and that it has depreciated the value of the land and that there is no likelihood of an increase in rentals. The income can be increased only slightly if the necessary repairs are made. No money is available for making these repairs. The tax burden is increasing on the property at the rate of over $1,500 per year. The 1939 tax bill amounts to $1,561 and penalties accruing in 1939 on prior tax delinquencies are $1,200, or a total of $2,761. Only the sum of $1,188 is available from income to apply on this $2,761. The undisputed evidence is that the fair cash market value of the property is not over $25,000. In addition to the bid, the purchaser at the foreclosure sale takes subject to delinquent taxes in excess of $19,000 and special assessments of $600, plus taxes accruing during the redemption period. Therefore, the cost to a purchaser who bids $7,000 would be around $29,000. It is desirable that property in litigation be restored to private ownership, providing that can be done without harming those who are interested. It will be necessary to raise money in order to make the necessary repairs and pay the de-

linquent taxes, penalties and special assessments. There does not seem to be any prospect that on a subsequent sale a substantially higher bid will be made. There is only a hope for such a bid. If this sale is not approved, the property will continue to deteriorate and may become a derelict and an eyesore. We are conscious of the solicitude of the chancellor for the interest of the bondholders, but do not see how the bondholders' position is bettered by the disapproval of the sale. True, they stand to secure a very small return on their investment, which is regrettable. From appellant's brief we assume that he intends tó pay up the delinquent taxes, penalties and assessments. In arguing for approval of the sale, he sets out these taxes are a burden which he will be required to bear. While the payment of these taxes, penalties and assessments will not benefit the bondholders, such payment will be of benefit to the people of the community. If we approve the sale the property will in due time be restored to private ownership, and the owner will probably rehabilitate the same, which will redound to the benefit of the community.

The decree allowed the sum of $4,319.50 for solicitor's fees, trustee's fees and various expenses in addition to court costs and extra fees, all of which were made paramount liens. Undoubtedly, all of the parties concerned have put forth their best efforts in performing their respective duties. However, all are confronted with a situation for which none of the parties is responsible. If the fees and charges which are prior liens, stand, the bondholders will participate in a minor share of the purchase price of $7,000. We believe that those who are entitled to receive the respective amounts allowed as prior liens should voluntarily reduce their fees and charges to fit in with the situation which all face. Because of the factual situation presented by the record, we are of the opinion that the chancellor should have approved the sale, subject to

the downward revision of the fees and charges. Therefore the order of the superior court of Cook county of May 29, 1940, disapproving the sale, is reversed and the cause is remanded with directions to the chancellor to conduct a hearing for the purpose of securing a reasonable voluntary reduction in the fees allowed, and that on the fees being so reduced the chancellor enter an order approving the sale.

*Reversed and remanded with directions.*
HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.